# In re G-D-, Respondent

*Decided November 23, 1999*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

In order for a change in the law to qualify as an exceptional situation that merits the exercise of discretion by the Board of Immigration Appeals to reopen or reconsider a case sua sponte, the change must be fundamental in nature and not merely an incremental development in the state of the law.

Royal F. Berg, Esquire, Chicago, Illinois, for respondent

Karen E. Lundgren, Assistant District Counsel, for the Immigration and Naturalization Service

Before:    Board En Banc:  SCHMIDT, Chairman; DUNNE, Vice Chairman; SCIALABBA, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, MOSCATO, and MILLER, Board Members. Dissenting Opinion: ROSENBERG, Board Member, joined by VILLAGELIU and GUENDELSBERGER, Board Members.

FILPPU, Board Member:

The respondent has filed a motion to reconsider our decision to dismiss his appeal. The motion is untimely, and we decline to consider the motion sua sponte. The motion will therefore be denied.


## I. PROCEDURAL HISTORY

On January 5, 1996, an Immigration Judge denied the respondent's application for asylum and withholding of deportation and granted him voluntary departure. The respondent timely appealed that decision. On September 26, 1997, we dismissed the respondent's appeal.

On April 30, 1998, the respondent filed the instant motion to reconsider. In his motion, the respondent argues that our decision in *Matter of O-Z- & I-Z-,* 22 I&N Dec. 23 (BIA 1998), warrants a reconsideration of our prior decision. The respondent asserts that our analysis in *Matter of O-Z- & I-Z-* favors his asylum claim, implying that our analysis in that case would lead

to a different outcome in his own. The respondent also cites *Kossov v. INS,* 132 F.3d 405 (7th Cir. 1998), issued subsequent to our decision in his case, and Congress' renewal of the "Lautenberg Amendment," *see* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101-167, § 599D, 103 Stat. 1195, 1261-63 (1989), *as amended*, in support of his request for reconsideration.[1]  Relying on these developments in the law, the respondent asks that we reconsider his case sua sponte, pursuant to 8 C.F.R. § 3.2(a) (1999).

In response, the Immigration and Naturalization Service opposes the motion as untimely. The Service also objects to the respondent's request for sua sponte reconsideration, arguing that the respondent should not be permitted to circumvent the regulatory limits on motions by soliciting the Board's authority to act sua sponte.

## II. TIMELINESS OF THE MOTION

The untimeliness of the respondent's motion is not at issue. A motion to reconsider must be filed within 30 days after the mailing of the Board's decision or on or before July 31, 1996, whichever is later. 8 C.F.R. § 3.2(b)(2).  The respondent's motion to reconsider was due on or before October 27, 1997. The respondent's motion was not filed, however, until April 30, 1998, more than 6 months after that date. The respondent's motion to reconsider is therefore untimely and precluded by regulation.

## III. REQUEST FOR SUA SPONTE RECONSIDERATION

Cognizant of the motion's untimeliness, the respondent asks that we reconsider his case on our own motion. The issue is whether, in this instance, the exercise of our discretion is warranted. We do not find that it is.

### A. Invocation of Sua Sponte Authority

The Board possesses discretion to reopen or reconsider cases sua sponte. 8 C.F.R. § 3.2(a); *see also Matter of J-J-,* 21 I&N Dec. 976 (BIA 1997).  As a general matter, we invoke our sua sponte authority sparingly, treating it not as a general remedy for any hardships created by enforcement

---

[1]The respondent also informed the Board that he had been notified of his eligibility for an immigrant visa pursuant to the DV-99 diversity immigrant visa program. *See generally* section 203(c) of the Immigration and Nationality Act, 8 U.S.C. § 1153(c) (1994 & Supp. II 1996).

of the time and number limits in the motions regulations, but as an extraordinary remedy reserved for truly exceptional situations. *Matter of J-J-, supra; see also* Motions and Appeals in Immigration Proceedings, 61 Fed. Reg. 18,900, 18,902 (1996) ("[S]ection 3.2(a) of the rule provides a mechanism that allows the Board to reopen or reconsider *sua sponte* and provides a procedural vehicle for the consideration of cases with exceptional circumstances."). It would be inappropriate to expansively employ this authority in a manner that contravened the intentions of Congress or failed to give effect to the comprehensive regulatory structure in which it exists.

### B. Significance of Motion Limits

The respondent is seeking reconsideration outside the time allowed for this type of motion. Motions to reconsider, as well as motions to reopen, are restricted in time and number. *See* 8 C.F.R. §§ 3.2(b), (c); *see also* 8 C.F.R. § 3.23(b) (1999). These limitations are creatures of regulation, crafted by the Attorney General at the behest of Congress. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 545(d), 104 Stat. 4978, 5066. They are specifically designed to expedite judicial review and to bring finality to immigration proceedings.[2] *See id.; see also Stone v. INS*, 514 U.S. 386 (1995). The import of those limitations is evident in Congress' decision to incorporate the regulatory limits directly into the statute for aliens in removal proceedings. *See* sections 240(c)(5), (6) of the Immigration and Nationality Act, 8 U.S.C. §§ 1229a(c)(5), (6) (Supp. II 1996); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 304, 110 Stat. 3009-546, 3009-593. The motions rules respond directly to the legislative interest in setting meaningful and effective limits on motions and ultimately in achieving finality in immigration case adjudications. Accordingly, we may not casually set those limits aside or otherwise undermine them through the exercise of our independent regulatory power to reopen or reconsider cases.

### C. Sua Sponte Authority and New Law

We must be persuaded that the respondent's situation is truly exceptional before we will intervene. In *Matter of J-J-, supra,* we did not explore or define what situations we would consider "exceptional" in nature. *Matter of X-G-W-,* 22 I&N Dec. 71 (BIA 1998), and this decision provide examples of the circumstances in which we deem it appropriate or inappropriate

---

[2]The record does not indicate whether the respondent has sought judicial review. In the event that the respondent has, it is incumbent upon him to so inform the Board. *See* 8 C.F.R. § 3.2(e).

to exercise our sua sponte authority to reopen or reconsider.

Our decision in *Matter of X-G-W-, supra*, illustrates the type of situation in which sua sponte action by the Board is appropriate. In that case we examined the impact of a recent amendment to the definition of the term "refugee" set forth in section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (Supp. II 1996). The statutory revision was so profound that the respondent in *Matter of X-G-W-* clearly acquired eligibility for relief by virtue of that particular change in the law, a change amounting to a reversal in the principles of asylum law applicable to coercive population control practices in China. *Cf. Asani v. INS,* 154 F.3d 719 (7th Cir. 1998) (discussing the Board's independent reopening authority in the context of new legislation affecting eligibility for relief).

We do not find a comparable situation here. The Board's decision in *Matter of O-Z- & I-Z-, supra,* does not reflect a fundamental change in the principles of the law of asylum. *Matter of O-Z- & I-Z-* involved the application of existing asylum principles to a specific set of facts, and we do not consider that decision to be a fundamental change in the law. Insofar as it might be construed as a change, that decision represents at most an incremental development in the law, not a departure from established principles. While *Matter of O-Z- & I-Z-* potentially enhances the stature of the respondent's claim, it does not announce a fundamental change.

For the respondent to prevail, we must be persuaded that a change in law is sufficiently compelling that the extraordinary intervention of our sua sponte authority is warranted. New case law regularly emerges from this Board and the federal courts. Much of that case law builds on the past, seldom reflecting dramatic departures from the legal principles that are routinely applied to resolve the appeals that come before us. If each incremental development in the case law were considered to be a change warranting reopening on the Board's own motion, the implications for the motions regulations and for the finality of proceedings would be profound. In our judgment, granting reconsideration or reopening in response to such "changes" would substantially erode the regulatory time and number limitations and undermine the goal of finality that we understand Congress sought to achieve. *See* 61 Fed. Reg. at 18,902 (noting, inter alia, in Supplementary Information that the time frame selected for filing motions to reopen is intended to accommodate changes in the law, facts, and circumstances).

Furthermore, unlike *Matter of X-G-W-, supra*, the respondent's case does not manifestly turn on the cited change in the law. In *Matter of X-G-W-,* the statutory amendment was so significant and its impact so unambiguous that we found it warranted a readjudication of the appeal. In contrast, the impact of our decision in *Matter of O-Z- & I-Z-* on the respondent's case is less obvious, and the change in the law, if any, far more subtle. We would be required to completely readjudicate the respondent's claim in light of this new precedent before we could discern whether it would

have any impact on the outcome of his claim. Engaging in such a readjudication would be tantamount to granting reconsideration, with its concomitant expenditure of adjudicatory resources, even if we were ultimately to determine that the new precedent did not alter the outcome.[3]

Moreover, the respondent here was granted voluntary departure, with an alternate order of deportation, at the time we dismissed his appeal from the Immigration Judge's denial of asylum. His options at that point were to *timely* seek reopening or reconsideration if circumstances allowed, to seek judicial review of our ruling, or to depart voluntarily.[4]  *See* 8 C.F.R. §§ 3.2(b), (c).  Once these options expired, the regulations severely restricted the respondent's ability to revive proceedings. Thereafter, for example, to obtain reopening he needed to demonstrate a change in country conditions affecting his asylum claim, or he needed to acquire the cooperation of the Service in filing a joint motion to reopen. *See* 8 C.F.R. § 3.2(c)(3).  This legal framework does not envision that the respondent could simply remain in the United States and subsequently obtain a complete reexamination of his claim by virtue of an incremental legal development of the sort at issue here. We do not believe it appropriate for us to create exceptions to the regulations in circumstances such as those presented in this case.

## IV. THE DISSENT

The dissent correctly observes that we have not readjudicated the merits of the respondent's asylum claim and chastises us for our apparent indifference. The dissent argues that the respondent's claim is persuasive on its face, provided that we apply our holding in *Matter of O-Z- & I-Z-, supra,* to his case. We do not agree. Although we have not readjudicated the respondent's claim, we have considered the motion papers. In our judgment, the motion papers do not make it clear that the respondent would prevail under *Matter of O-Z- & I-Z-* and that this case presents an exceptional situation.

The respondent has already enjoyed a full adjudication on the merits, first by an Immigration Judge and then by this Board, and his claim has

---

[3]The other legal developments cited by the respondent are similarly unavailing. It is not clear from the respondent's motion whether the respondent is citing *Kossov v. INS, supra*, and the Lautenberg Amendment as legal developments or as further evidence of country conditions. If the respondent means to cite the opinion of the United States Court of Appeals for the Seventh Circuit or the views of Congress as evidence of country conditions, the proper vehicle is a motion to reopen establishing changed country conditions. *See* 8 C.F.R. § 3.2(c)(3)(ii).

[4]We observe that had the respondent complied with the terms of his voluntary departure order, he might have returned to the United States as an immigrant through the diversity visa program.

twice been found wanting. He also had the opportunity to seek judicial review of our prior adjudication. We do not share the dissent's premise that the respondent is a refugee entitled to protection.

The dissent argues that we should apply the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), in assessing whether to exercise our independent reopening authority. The balancing test in *Mathews v. Eldridge*, however, concerns questions of procedural due process. We see no procedural due process concerns arising from our discretionary decision declining to exercise our independent reopening powers on behalf of the respondent. The respondent's right to a full and fair hearing on his asylum claim has *not* been compromised. The respondent availed himself of his statutory and regulatory rights, which resulted in a full hearing on his claim and thereafter an appeal of the decision of the Immigration Judge. The respondent also had the ability to file a timely motion to reconsider and continues to have the ability to file a motion to reopen based on changed circumstances. *See* 8 C.F.R. §§ 3.2(b)(2), (c)(3)(ii). The record does not reflect that the respondent's opportunity to put forth his claim has been abbreviated, truncated, or diminished in any way.

Furthermore, in making its due process argument, the dissent fails to apply fully the balancing test of *Mathews v. Eldridge, supra*, at 335. For example, the dissent fails to meaningfully take into account the profound importance of finality, a governmental interest that must be weighed and one that was a principal articulated focus of the regulations respecting motions and the legislation on which they are based. Were we to assume the policy of sua sponte reconsideration advocated by the dissent, it appears that we would be compelled to readjudicate the merits of any case alleging an erroneous result, whether based on new legal developments or not, in order to ensure that error had not, in fact, occurred. In other words, we would, in practice, be required to resolve the merits of the claim underlying the motion *before* determining whether to grant or deny the motion. Any untimeliness would be irrelevant, unless the motion lacked substantive merit.

However, this approach would substantially erode, if not altogether eviscerate, the principle of finality underlying the regulations. It would also require a substantial commitment of our resources in the readjudication of previously resolved cases, at the expense of our ability to adjudicate other appeals or timely filed motions. In the context of this case, we are not prepared to exercise our discretionary powers in a way that would undermine the express time limits on motions set forth in the regulations.

## V. CONCLUSION

In our judgment, exercising our sua sponte authority in this instance would be inconsistent with the word and purpose of the regulatory limits on

motions to reconsider. We are not persuaded that this case presents an exceptional situation such that the respondent should be exempt from the time limits on motions set forth in the regulations. Accordingly, we decline to reconsider his appeal sua sponte. Because the motion is untimely, it will be denied.

**ORDER:** The motion is denied.

*DISSENTING OPINION:* Lory Diana Rosenberg, Board Member, in which Gustavo D. Villageliu and John Guendelsberger, Board Members, joined

I respectfully dissent.

We have before us a Lithuanian Jew whose asylum claim we originally denied because we did not recognize the repeated mistreatment he suffered at the hands of anti-Semites as constituting persecution or the basis for a well-founded fear of persecution within the meaning of the refugee definition at section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (Supp. II 1996). Since our dismissal of his appeal on September 26, 1997, we have issued a precedent expressly recognizing that such an aggregation of mistreatment by anti-Semites in the Ukraine amounts to persecution. *See Matter of O-Z- & I-Z-,* 22 I&N Dec. 23 (BIA 1998).

The respondent technically cannot seek reopening or reconsideration, however, because his motion is time-barred. *See* 8 C.F.R. §§ 3.2(b)(2), (c)(2) (1999). Accordingly, the respondent has no recourse but to ask that we reconsider his asylum claim sua sponte, pursuant to our authority under 8 C.F.R. § 3.2(a), in light of this recent precedent and similarly significant circuit court authority.

The majority, without meaningfully determining whether the respondent has demonstrated a prima facie claim of persecution under our current precedent, refuses to reconsider our prior decision because doing so might compromise administrative efficiency. Although the majority cautions against exercising our sua sponte powers unduly, neither considerations of administrative efficiency nor concerns related to finality in immigration proceedings compel us to turn a blind eye to a legitimate asylum claim, particularly where we may have improperly dismissed that claim.

Moreover, unlike the majority, we agree with the respondent that our decision in *Matter of O-Z- & I-Z-*, *supra*, represents a significant departure from past law and, as applied to the respondent's case, warrants the reopening of his proceedings. To decline to reconsider his claim in light of current precedent that is likely to change the result in his case is to place administrative convenience above our obligation to protect asylum-seekers.

## I. THE EXERCISE OF SUA SPONTE AUTHORITY

Our regulations empower us to reopen or reconsider sua sponte any

case in which we have rendered a decision. *See* 8 C.F.R. § 3.2(a). We also possess the authority to certify cases to ourselves. *See* 8 C.F.R. § 3.1(c) (1999). As long as we remain within our appellate and subject matter jurisdiction, these discretionary powers are not limited, restricted, or qualified. The regulation at 8 C.F.R. § 3.1(d)(1) specifically delegates to this Board the Attorney General's authority to exercise discretion "as is appropriate and necessary for the disposition of the case." Thus, Congress and the Attorney General have entrusted us with considerable latitude to intervene in individual cases where fundamental fairness and the interests of justice so warrant. *See Matter of Roman*, 19 I&N Dec. 855, 856-57 (BIA 1988) (permitting collateral attack on a prior proceeding where there was "a gross miscarriage of justice" in that proceeding); *see also Matter of Ng*, 17 I&N Dec. 63 (BIA 1979) (involving a grant of nunc pro tunc permission to reapply for admission after deportation); *Matter of Ducret*, 15 I&N Dec. 620 (BIA 1976) (same); *Matter of Vrettakos*, 14 I&N Dec. 593 (BIA 1973, 1974) (same); *Matter of S-N-,* 6 I&N Dec. 73 (BIA, A.G. 1954).

In determining whether to exercise our delegated power under 8 C.F.R. § 3.2(a) to reopen and reconsider the respondent's claim, sua sponte, we should apply the test prescribed in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which takes into account three factors: the interest at stake for the individual; the risk of erroneous deprivation of that interest; and the Government's administrative burden. *See Padilla-Agustin v. INS*, 21 F.3d 970 (9th Cir. 1994); *Hernandez v. Cremer*, 913 F.2d 230 (5th Cir. 1990); *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555 (11th Cir. 1989), *aff'd sub nom. McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479 (1991).

In balancing these factors, we conclude that the respondent's individual interest in a correct adjudication of his asylum claim leading to asylum protection in this country, and the danger of persecution he faces if returned to his country, outweighs the governmental interest in regulated time limits on the filing of motions or finality in immigration proceedings. *See Kossov v. INS*, 132 F.3d 405, 408 (7th Cir. 1998) (finding a fundamental failure of due process warranting a sua sponte remand where asylum applicants were not advised of their right to apply for asylum); *see also Nazarova v. INS*, 171 F.3d 478, 482-83 (7th Cir. 1999) (citing *The Japanese Immigrant Case*, 189 U.S. 86 (1903)); *Asani v. INS*, 154 F.3d 719, 728 (7th Cir. 1998) (concluding that the Board should have invoked its sua sponte authority to remand the case so that respondents could apply for suspension of deportation). We note, in addition, that in cases involving claims of persecution, the United States Government purportedly shares the respondent's interest in seeing that he is not wrongly returned to a country where he has faced or is likely to face persecution on account of a characteristic protected under the refugee definition.

We recognize that the respondent had an opportunity to set forth his claim of repeated incidents of mistreatment on account of his Jewish iden-

tity in what previously may have appeared to constitute a full and fair hearing, *see Matter of G-D-,* 22 I&N Dec. 1132, at 1135 (BIA 1999); however, that hearing resulted in a denial of asylum that is called into question by our subsequent issuance of *Matter of O-Z- & I-Z-, supra.* Thus, this is not a situation in which there is no arguable lack of due process "because Petitioner had the benefit of a full hearing, against which he lodges no complaints." *Cf. Dielmann v. INS*, 34 F.3d 851, 853 (9th Cir. 1994) (rejecting a due process claim as "quite vague"). By contrast, the respondent's motion is precise and sets forth the exact basis on which our prior denial of asylum would now not stand under Board precedent.

In *Matter of J-J-,* 21 I&N Dec. 976 (BIA 1997), we explained that our sua sponte authority to reopen or reconsider cases was not intended as a general cure for filing defects or personal hardships. Citing *Matter of J-J-, supra,* the majority here trivializes the respondent's situation, implicitly casting his inability to reopen proceedings as a "hardship"—and a fairly common one at that. The respondent is not, however, asking us to remedy a "hardship"; he is asserting, correctly, that according to our own precedent in *Matter of O-Z- & I-Z-, supra*, he is eligible for asylum and that his case was wrongly decided by this Board. This is not a situation in which we may turn a blind eye in the name of administrative efficiency.

While Congress has indicated a desire to achieve finality in immigration proceedings, I do not believe that Congress intended this general legislative goal, however important, to truncate our ability to remedy wrongs in individual cases. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 545(d), 104 Stat. 4978, 5066; *see also* Motions and Appeals in Immigration Proceedings, 61 Fed. Reg. 18,900, 18,902 (1996); *Stone v. INS*, 514 U.S. 386 (1995). The final rule that implemented the current motion regulations specifically presumed that our sua sponte authority would be used to entertain motions to reopen and motions to reconsider in appropriate cases that were filed out of time. The final rule states:

> The Department does not agree with the commenters' suggestions that a "good cause exception" would be an appropriate procedural mechanism for addressing exceptional cases that fall beyond this rule's time and number limitations. *Instead, section 3.2(a) of the rule provides a mechanism that allows the Board to reopen or reconsider sua sponte* and provides a procedural vehicle for the consideration of cases with exceptional circumstances. 61 Fed. Reg. at 18,902 (emphasis added) (Supplementary Information).

Thus, a "good cause exception" to address exceptional cases was deemed not to be necessary, as specified in the final rule above, because the rule provides the Board sua sponte authority to act in such exceptional cases. Notably, the unrestricted grant of sua sponte authority to consider exceptional cases appropriate for reopening or reconsideration, in lieu of a "good cause exception," is a far cry from the "profound" change in the "fundamental . . . principles of the law" exception espoused by the majority,

which cites *Matter of X-G-W-,* 22 I&N Dec. 71 (BIA 1998) (addressing a recent statutory amendment to the definition of refugee). *Matter of G-D-, supra*, at 1135. Nothing in the regulations even remotely supports the view that we are expected to apply such a constricted standard in interpreting our authority to address exceptional cases.

In short, the rule that sets the parameters of our sua sponte authority does *not* require us to assume the strictest posture possible, and there is no suggestion in the regulations that the Attorney General expected the Board to so limit our consideration in this way. To the contrary, the Supplementary Information accompanying the regulation indicates that the Attorney General expects us to use our sua sponte authority in precisely the type of situation presented here.

As indicated above, the protection of asylum-seekers is a moral cornerstone of the immigration laws. *See INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). We are obligated to give asylum-seekers a fair and genuine opportunity to seek that relief. Even the strict regulations that govern motions to reopen and reconsider exempt asylum-seekers from the time and number limits when the proper circumstances arise. *See* 8 C.F.R. § 3.2(c)(3)(ii) (1999); *cf.* 8 C.F.R. § 208.4(a)(4)(i)(B) (1999) (permitting asylum applications to be filed after the 1-year filing deadline when based on changed circumstances, "including changes in applicable U.S. law, that create a reasonable possibility that applicant may qualify for asylum"). Our sua sponte authority provides an additional mechanism by which we can achieve a just result in appropriate asylum cases.

We have just such a case before us. The respondent has a meritorious asylum claim that warrants approval pursuant to our recent decision in *Matter of O-Z- & I-Z-, supra.* We are *not* here juxtaposing the Government's abstract concern for finality in proceedings with some conjectural enhancement of the respondent's asylum claim. Rather, there would be a concrete difference in the outcome of the case on account of our own precedent. *See id.* Whether there has been a change in the law, a previous misapplication of existing law, a combination of both, or some other impediment to a fair proceeding and a just result, we simply cannot disregard the fact that the respondent is likely to prevail today under our recent decision in *Matter of O-Z- & I-Z-, supra*.

Our interest in finality should not trump our interest in justice; we should therefore revisit the respondent's case.[1] *Cf. Rodriguez-Roman v.*

---

[1] The Immigration and Naturalization Service never executed the respondent's deportation order. *See Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994) (holding that deliberate failure by the Service to enforce a final order is a factor favorable to the alien in deciding whether proceedings should be reopened); *cf. Matter of Farinas*, 12 I&N Dec. 467, 471 (BIA 1967) (concluding that "neither the finding of deportability nor the order of deportation is clothed with the armor of immunity from attack while the alien is still in the United States").

*INS*, 98 F.3d 416 (9th Cir. 1996) (finding that the circuit court's failure to transfer a petition to remedy a filing error would result in an untimely filing and the ultimate deportation of an alien with a meritorious claim for asylum). Especially in the asylum context, insulating an erroneous decision from consideration in this manner would be a miscarriage of justice. *See Matter of Farinas*, 12 I&N Dec. 467, 471 (BIA 1967).


## II. APPLICATION OF MATTER OF O-Z- & I-Z-

The majority trivializes the significance of our decision in *Matter of O-Z- & I-Z-, supra,* by characterizing that decision as the mere application of established principles of asylum law to a particular set of facts. This characterization begs the question of why we published the decision as a precedent to be binding on "all officers and employees of the Service or Immigration Judges in the administration of the Act." 8 C.F.R. § 3.1(g). Furthermore, it ignores the struggle in which this Board and the circuit courts have engaged in defining persecution and evaluating the effect of cumulative mistreatment.

The question of how to treat cumulative evidence in the context of determining whether a respondent has satisfied his or her burden of proving eligibility for relief from deportation or removal has been one of some contention within the Board for several years. It has been the focus of sharp debate in the context of suspension of deportation and relief under section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994). *See, e.g., Matter of O-J-O-*, 21 I&N Dec. 381 (BIA 1996) (compare majority, concurring, and dissenting opinions); *Matter of Edwards*, 20 I&N Dec. 191 (BIA 1990) (same). The Board has also been criticized for our handling of questions of cumulativeness. *See, e.g., Georgiu v. INS*, 90 F.3d 374 (9th Cir. 1996) (faulting the Board for failing to explain how a single adverse factor in a suspension case outweighed all positive factors considered cumulatively); *Watkins v. INS*, 63 F.3d 844 (9th Cir. 1995) (faulting the Board for failure to consider the cumulative effect of factors in a suspension case); *Prapavat v. INS*, 662 F.2d 561, 563 (9th Cir. 1981) (finding abuse of discretion where the Board failed to consider the cumulative effect of all relevant factors in a suspension case); *see also Cortes-Castillo v. INS*, 997 F.2d 1199 (7th Cir. 1993) (same in section 212(c) denial); *Diaz-Resendez v. INS, 960 F.2d 493 (5th Cir. 1992) (same in section 212(c) denial).*

Given this case law, the majority's characterization of *Matter of O-Z- & I-Z-, supra,* as, at best, an incremental development in asylum law is plainly incorrect. To the contrary, *Matter of O-Z- & I-Z-* adds significantly to the Board's interpretation of the refugee definition in the statute and should be recognized accordingly. Factually, the respondent's experiences are comparable to those of the respondents in *Matter of O-Z- & I-Z-, supra.* As in that

case, the respondent was attacked, his property vandalized, and his loved ones harmed, expressly because of his Jewish identity. In *Matter of O-Z- & I-Z-, supra*, we held that the aggregation of incidents such as those suffered by the respondent amounted to persecution and warranted a grant of asylum.

In addition, subsequent to the filing of the respondent's motion, the United States Court of Appeals for the Ninth Circuit reached the same conclusion. In *Korablina v. INS,* 158 F.3d 1038 (9th Cir. 1998), that court looked to the cumulative effect of the respondent's sufferings in her native Ukraine, which included threats and assaults by anti-Semitic ultranationalists, and found past persecution, as well as a clear probability of future persecution, within the meaning of the Act. *Id.* at 1044. The Ninth Circuit's conclusion in *Korablina* reflects two important points relevant to the exercise of our sua sponte authority: first, that anti-Semitic persecution in the European states that formerly were part of the Soviet Union remains real today; and second, that the Board's failure to recognize the effect of cumulative incidents of harm, such as those suffered by the respondent before us, indicates that the Board did not recognize such cumulative incidents prior to *Matter of O-Z- & I-Z-, supra.* Consequently, our decision in *Matter of O-Z- & I-Z-* should not be dismissed, as the majority asserts, as a mere "incremental development in the law." *Matter of G-D-, supra*, at 1135.

Although the majority posits the spectre of having to reengage in an adjudication on the merits were we to exercise our sua sponte authority, the majority completely fails to mention that in determining that a case is an exceptional one warranting reopening, we may look, among other factors, to whether the respondent has presented a "prima facie" claim. *See, e.g.,* 8 C.F.R. § 3.2(a). A prima facie claim is one in which statutory eligibility has been demonstrated and reopening is likely to yield a different result. *Matter of Coelho*, 20 I&N Dec. 464 (BIA 1992) (involving a claim that had already been the subject of a prior hearing); *see also Matter of L-O-G-,* 21 I&N Dec. 413, 419 (BIA 1996) (holding that reopening is warranted "'where the new facts alleged, when coupled with the facts already of record, satisfy us that it would be worthwhile to develop the issues further at a plenary hearing on reopening.' *Matter of Sipus*, [14 I&N Dec. 229], 231 [(BIA 1972)]").

The Board's published decisions are to "serve as precedents in all proceedings involving the same issue or issues." 8 C.F.R. § 3.1(g). The respondent's original claim was dismissed because a majority of the panel considering his claim did not believe that the repeated incidents of harassment and harm he suffered, as the result of being Jewish, amounted to persecution on account of a protected ground under the refugee definition. Under our precedent in *Matter of O-Z- & I-Z-, supra*, it is highly unlikely that we now would dismiss the factual basis of his claims as failing to rise to the level of persecution. As stated above, the aggregation of incidents such as those suffered by the respondent amount to persecution and warrant

a grant of asylum. *Id.*

Thus, we are presented with a record that indicates, contrary to our original opinion, that the respondent faces return to a country where he has been persecuted as the result of cumulative incidents of harassment and harm imposed because he is Jewish, and where he continues to have a well-founded fear of persecution on this very basis. We are not being asked to cure a filing defect; we are not being petitioned to disregard the goal of finality in proceedings. Rather, we are being asked to prevent an injustice and to give the respondent a fair hearing based on current law, by which we are bound. Neither the regulations nor the immigration statute compels us to return a particular refugee to a country of persecution because to do otherwise might confound a general legislative goal. We should be protecting refugees from persecution, not protecting our regulations from refugees.

Moreover, the respondent's request that we take administrative notice of the Lautenberg Amendment, *see* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101-167, § 599D, 103 Stat. 1195, 1261-63 (1989), *as amended*, and the decision of the United States Court of Appeals for the Seventh Circuit in *Kossov v. INS, supra,* subsequent to our September 26, 1997, dismissal of the respondent's appeal, is not unreasonable. It is made all the more reasonable by this and other developments in his own circuit upholding the right to be heard in immigration proceedings. *See Nazarova v. INS, supra* (finding exceptional circumstances to overcome failure to appear where no meaningful opportunity existed for the respondent to be heard). To the degree that such recent Seventh Circuit precedent represents sources of factual information relevant to the respondent's asylum claim, it possesses probative value and the Board may take administrative notice of it. *See, e.g., Kaczmarczyk v. INS,* 933 F.2d 588, 593 (7th Cir.), *cert. denied,* 502 U.S. 981 (1991). Given that such sources of information arose subsequent to the respondent's hearing, it is all the more appropriate that we take them into account when considering his request for sua sponte consideration. *See Matter of J-J-, supra*, at 985 (Villageliu, concurring).

Based on both the Board's recent precedent decision and recent circuit case law, if the respondent's appeal were to come before us today, he would more than likely be granted asylum. Without the exercise of our sua sponte authority, the respondent faces return to persecution. This is exactly the reason why our sua sponte authority to reopen and reconsider prior adjudications exists. We should exercise it accordingly.